## Case No. 11,764.

### The RICHARD BUSTEED.

[1 Spr. 441; 21 Law Rep. 601; 40 Hunt. Mer. Mag. 196.] [1]

District Court, D. Massachusetts. Oct., 1858.

MARITIME LIENS—STATE STATUTE—LIMITATION—MARITIME CONTRACTS.

1. Contracts for the building of sea-going ships are maritime.

[Cited in The Sarah Jane, Case No. 12,349. Cited, but not followed, in Young v. The Orpheus, Id. 18,169.]

[Cited in Foster v. The Richard Busteed, 100 Mass. 401.]

2. Liens on domestic ships, given by a state statute, in cases of contracts maritime in their nature, may be enforced in the district courts of the United States, in admiralty.

3. The restriction of sixty days in the Revised Statutes of Massachusetts, c. 117, § 4, if it be incorporated into the statute of that state of 1855, c. 231, is not applicable to proceedings in this court.

This was a suit in rem, to enforce a lien given by a statute of Massachusetts. The claim was for labor performed in the construction of a sea-going ship, of above six hundred tons burden, built at Quincy.

J. H. Prince, for libellants.

J. L. English, for claimants.

SPRAGUE, District Judge. Suits like the present have been so often sustained, in this and other admiralty courts in the United States, that I should have exercised jurisdiction, without remark, were it not for the recent case of The Jefferson (People's Ferry Co. v. Beers, 20 How. [61 U. S.] 393). That case has been considered by a learned admiralty judge,—The Coernine [Case No. 2,914],—and I have reason to think, by the bar generally, as clearly indicating that the supreme court will not. hereafter, sanction the taking of jurisdiction by the district courts, of any claims by material men, or of any lien existing only by state law. The reasons for this apprehension are, first, the supposition that the court, in that case, decided that a contract for labor and materials, in building a vessel, is not maritime, and inability to see any ground of distinction between such a contract and one for repairs or outfits; second, the significant caveat at the close of the opinion, as to liens by state law. Upon examining that case, I do not feel constrained to consider it as deciding that contracts relating to the building of vessels are not maritime. I deem it necessary to give my reasons for this conclusion. That case called for a decision only of the question, whether a lien existed by the general maritime law, in favor of the builders, under the particular circumstances of the case, the state law giving no lien. The pre-

[1] [Reported by F. E. Parker. Esq., assisted by Charles Francis Adams, Jr., Esq., and here reprinted by permission. 40 Hunt, Mer. Mag. 196, contains only a partial report.]

cise point is thus stated in the opinion of the court:

"We have then the simple case, whether these ship-carpenters had a lien for work and materials, that can be enforced in rem, in the admiralty."

The case did not call for a decision of the question, whether a suit in personam could have been maintained upon such a contract, and nothing is more familiar in the admiralty, than that such suits are maintainable where no lien exists. The General Smith, 4 Wheat. [17 U. S.] 438; Andrews v. Wall, 3 How. [44 U. S.] 572; New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 392; The Boston [Case No. 1,673]; The Trelawney, 3 C. Rob. Adm. 216, note; Brevoor v. The Fair American [Case No. 1,847]; American Ins. Co. v. Johnson [Id. 303]; The Merchant [Id. 9,434]; Clerke's Praxis, tit. 1. The decision we are now examining was against the lien. This may have been because the contract was not maritime, or because, being maritime, no lien was attached to it, or on both these grounds. It seems to me most reasonable to believe that the decision of the court rested upon the ground that no lien arose from the contract, even if maritime; and that what is said in the opinion against the maritime character of the contract may be regarded as the reasoning, or dictum, of the learned judge who delivered the opinion,—entitled, indeed, to great deference and respect, but not absolutely binding. It is nowhere distinctly announced that a contract for the construction of a ship is not maritime, and the reasoning to that effect is so blended with the question, whether a lien would arise where the owner was present, and not without credit,—that it cannot be said that the question, as to the maritime character of the contract, was separately, or independently, considered or decided. The opinion, in speaking of maritime contracts, does so in such a manner as to indicate that the only contracts in the mind of the writer were those which carry with them liens. Thus he says: "The admiralty jurisdiction, in cases of contract, depends, primarily, upon the nature of the contract, and is limited to contracts, claims, and services, purely maritime, and touching rights and duties appertaining to commerce and navigation." This, standing alone, would seem to apply to all contracts, as well those to be enforced in personam as in rem. But the next sentence in the opinion is: "In considering the foregoing description, it must be borne in mind that liens on vessels encumber commerce, and are discouraged." This clearly evinces that the only contracts then under discussion were those which carried with them the incumbrance of a lien. The opinion then proceeds to state under what circumstances a lien does or does not exist, saying in the close: "It would be a strange doctrine to hold the ship bound, in a case where the owner made the contract in writing, charging himself to pay, by installments, for building the vessel, at a time when she was neither registered nor licensed as a sea-going ship." Thus announcing that no lien arose on such a contract. But, as if continuing the same discussion, the next words are: "So far from the contract being purely maritime, and touching rights and duties appertaining to navigation (on the ocean or elsewhere), it was a contract made on land, to be performed on land. The wages of the shipwrights had no reference to a voyage to be performed; they had no interest or concern whatever in the vessel, after she was delivered to the party for whom she was built; they were bound to rely on their contract." Now, it is to be observed, that the only remark or expression in the whole opinion, against that contract's being maritime, is found in the words, "so far from the contract being purely maritime." And after only a few sentences, and as a part of the reasoning upon which that remark rested, it is said: "They (the shipwrights) had no interest or concern in the vessel, after she was delivered to the party for whom she was built; they were bound to rely on their contract." That is, they had no lien. The connection in which the absence of lien is urged, and the whole course of the reasoning, indicate that the question whether that contract was maritime, received no distinct consideration, as being separable from the question of lien. The opinion then cites the case of Clinton v. The Hannah [Case No. 2,898], which was a suit in rem to enforce a lien. To consider the decision to be merely that no lien arose, makes it more rational in itself, and more consistent with other decisions of the same high tribunal. I am further led to believe that the remark against that contract's being maritime, did not emanate from the whole court, because of the grounds upon which it is placed. Only two reasons are assigned against the maritime character of the contract. The first and principal one is, that the contract was made on land, to be performed on land. But this is very often true as to the furnishing of sails, rigging, ship-stores, and materials for the repairing of old vessels, to be delivered at a store or loft, or on a wharf; and even as to the labor in making the repairs when the vessel is on a marine railway; for which, upon foreign vessels, a maritime lien has always existed, except under the prohibitions of the English courts of common law. Would it, in legal contemplation, make a difference whether the articles were delivered by the artisan on the deck of the ship, or on the pier where she lay; or whether the rigger, or block-maker, put his work on the vessel while on the stocks, or after she was launched? If so, it would be worth while to remark that a new vessel is usual-

ly delivered by the builder on the water, and that a great proportion of the labor and expense of her construction and apparel is performed and incurred after she is afloat.

If it should be asked, why should a contract for labor upon a vessel, new or old, when performed on land, be maritime, I answer, because it is necessary, and goes directly to fit that vessel for use upon the navigable waters of the sea. The vessel is designed exclusively for maritime purposes; she is to be used solely upon the sea, as the instrument of commerce and navigation. Every contract that is made, either for the creation or preservation of a vessel, and every act in the performance of such contract, must have reference to her nautical use. Every timber that is put into her frame, every plank that is bent upon her hull, every seam that is calked, must be adapted with peculiar skill, exclusively for nautical and maritime use, and almost every question that can arise under such contract, must have reference to such use and adaptation, and require the experience and skill of nautical experts for its solution. One of the most frequent questions that arises, upon the construction or repairs of a ship, is of her seaworthiness; and what question can be more peculiarly and emphatically maritime, and what tribunal so appropriate to investigate and decide it, as a court of admiralty, if such court can answer, at all, the purposes of its creation?

The second reason assigned against the maritime character of the contract is, "that the wages of the shipwrights had no reference to a voyage to be performed." This cannot mean that they had not reference to some voyage to be performed; because the sole purpose for which a ship is created, or preserved, is to perform voyages on the sea. The meaning, therefore, must be that they had no reference to a particular and specified voyage. Can that be material? If a sea-going vessel, seeking employment, is in need of spars and rigging, to fit her for sea, and a mechanic supplies them, can the nature of his claim be affected by the accidental circumstance that the particular voyage upon which she was first to proceed, was agreed upon before, or not until after, the work was done? Will his claim in the one case be maritime, and in the other not, when in both it was certainly known that she was to proceed on some voyage, for which the repairs were essential? Two cases only are cited as authority; both from Bee's Reports, —Clinton v. The Hannah [supra], and Turnbull v. The Enterprize [Case No. 14,242],— both decided by the same judge, and both questions of lien; one for the construction of a new vessel, and the other for money furnished to fit out an old one. These decisions were made before the existence of our government. In those cases the judge looked only to the English doctrine, and did not even glance at any other than common law

authorities. The only inquiry was, what powers had been left to the English admiralty, under the prohibitions of rival courts. The decision was founded solely on the jurisdiction of the English admiralty, after it had been shrivelled and paralyzed by prohibitions from hostile and narrow-minded tribunals, and from which, now, in a more enlightened age, it is recovering by means of restoiatives from parliament. It has been so often decided, that I presume it is now beyond controversy, that the extent of English admiralty jurisdiction is no criterion of that of the courts of the United States. Peyroux v. Howard, 7 Pet. [32 U. S.] 324, 341; The General Smith, 4 Wheat. [17 U. S.] 438; The De Soto (Waring v. Clarke) 5 How. [46 U. S.] 454; New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344; The Genesee Chief, 12 How. [53 U. S.] 443; The Ann Elizabeth (DuPont de Nemours v. Vance) 19 How. [60 U. S.] 162; The Mopang (Ward v. Peck) 18 How. [59 U. S.] 267. In each of these cases the supreme court has exercised jurisdiction, where the English admiralty would not.

In the case of Turnbull v. The Enterprize [supra], the only inquiry was, whether a lien arose upon the contract therein stated. No other question is touched. Clinton v. The Hannah [supra] is the only case cited that bears upon the present inquiry, and that, too. was to enforce a lien. Against this single decision, made by a single state judge, upon the alleged practice of courts held in thraldom by common law tribunals, may be cited numerous and far higher authorities, establishing the position that contracts for the building of ships are maritime. Read v. The Hull of a New Brig [Case No. 11,609]; The Young Mechanic [Cases Nos. 18,180 and 18,-181]; Hull of a New Ship [Case No. 6,859]; Stevens v. The Sandwich [Id. 13,409]; Davis v. New Brig [Id. 3,643]; Boon v. The Hornet [Id. 1,640]; Parmlee v. The Charles Mears [Id. 10,766]; Purinton v. The Hull of a New Ship [Id. 11,472]; Marine Ordinances, tit. 2, art. 1; Ben. Adm. §§ 213, 264, 275; Conk. Adm. 66, 67; also, the reasoning of the court in Raymond v. The Ellen Stewart [Case No. 11,594] and Wick v. The Samuel Strong [Id. 17,607].

One of the most learned admiralty judges of this or any other country has said: "All civilians and jurists agree that in this appellation (maritime contracts) are included * * * contracts for maritime service in the building, repairing, supplying and navigating of ships," &c. De Lovio v. Boit [Case No. 3,776]. See authorities there cited.

Another consideration: There is no ground, either in reason or authority, for a distinction between contracts for the construction, and contracts for repairs of a vessel. As we have seen, the only reasons assigned in the opinion against the former's being maritime, apply also to the latter,—and why should a contract to repair or re-construct a part of

an old vessel be maritime, and a similar contract to construct the same part of a new vessel, not be, or, why should the making or furnishing a suit of sails, a cable, or a rudder, for an old ship, be maritime, while doing the same for a new ship should not? The only authority cited, that of The Hannah, goes equally against both construction and repairs. The decision and the reasoning in that case rested, as we have seen, altogether upon the doctrines and prohibitions of the common law courts, which were not limited to original construction, or bounded by high or low water mark, but went against labor performed, and all bills incurred upon vessels within the body of a county. Ross v. Walker, 2 Wils. 265. In the same intolerant spirit, the common law judges attempted also to dwarf and cripple the chancery jurisdiction, and that they did not succeed was only owing to a more vigorous resistance.

Contracts for the building of vessels thus standing in principle and reason and upon the authorities, even including the English, on the same ground with those for repairing vessels, it seems necessarily to follow that, if the former be not maritime, the latter are not. That the latter are maritime, and that suits by material men for repairs are cognizable in the admiralty, has been so often decided as to be beyond controversy. I cite some of the authorities: Peyroux v. Howard, 7 Pet. [32 U. S.] 324; The General Smith, 4 Wheat. [17 U. S.] 438; Hull of a New Ship [Case No. 6,859]; Davis v. Child [Id. 3,628]; Stevens v. The Sandwich [supra]; The Jerusalem [Case No. 7,294]; The Nestor [Id. 10,123]; The Robert Fulton [Id. 11,890]; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409; Phillips v. The Thomas Scattergood [Case No. 11,006]; Davis v. New Brig [Id. 3,643]; Zane v. The President [Id. 18,201]; The Young Mechanic [supra]; Boon v. The Hornet [supra]; Read v. Hull of a New Brig [Case No. 11,609]; The Chusan [Id. 2,717]; Purinton v. Hull of a New Ship [Id. 11,472]; The Kiersage [Id. 7,762]; The Sam Slick [Id. 12,282]; 12th Adm. Rule; The Isaac Newton [Case No. 7,089]; The Alexander, 1 W. Rob. Adm. 346. Now I cannot believe that all contracts by material men are to cease to be maritime, or that all admiralty jurisdiction heretofore exercised over liens created by the state enactments is to be relinquished. I certainly cannot presume that a jurisdiction, which has been exercised in accordance with the direct authority of Peyroux v. Howard, 7 Pet. [32 U. S.] 324, and in obedience to the twelfth admiralty rule of the supreme court, and under which many vessels have been sold, and titles acquired, is now to be overturned, as never having rested upon any legal foundation. I am of opinion that the contract now before me is maritime, and, as such, cognizable by this court.

The next question is, whether the lien therefor, given by the state statute, can be enforced by the courts of the United States.

One would think that the case of Peyroux v. Howard, 7 Pet. [32 U. S.] 324, and the twelfth admiralty rule of the supreme court, were sufficient to settle that question. But, independent of these and other conclusive authorities, I think that the jurisdiction is maintainable on principle. It is true, a state cannot give to a federal court jurisdiction, nor clothe it with new powers or processes. The statute of Massachusetts attempts to do neither. This court has its jurisdiction, "admiralty and maritime," under the federal constitution. Its powers and processes are its own, and are independent of state enactments. But state legislation may give rights to individuals. It gives to the workman on a house, or on a domestic vessel, a lien on the house or the vessel. This lien is a right, a privilege, a jus in re, a proprietary interest in the house or the vessel. The mechanic may vindicate this right in the appropriate tribunals. The state legislature gives its own courts special powers, to enable them to enforce the right against the house or the vessel; but leaves the mechanic, in the case of a vessel, the option to enforce his lien, either in the state courts, or in the federal court, as a court of admiralty. It makes no attempt to confer any powers on the federal courts, either in the way of jurisdiction, or of process. In the same way, while private parties cannot give this court jurisdiction by consent, yet parties may by their agreements create new rights, and these new rights may be enforced in this court, by admiralty process, if they be of a class and character to which that process is appropriate. The only question under a statute right (whether given by congress or a state), as under a right created by parties, or existing by the general law, is whether the right is maritime in its nature.

In this case, the right is an interest, a jus in re, in a vessel, attached by law to a contract for work on the vessel. This is maritime in its nature. That the vessel is owned in the same state where the work was done, is a fact affecting only the existence of the right or lien, not the question whether, if it exists, it be maritime. If the vessel be owned in another state, the right or lien arises by general maritime law; while, in case of the domestic ship, it exists by virtue of positive enactment of legislatures having authority to create such a right, in a domestic vessel. I shall not hesitate, therefore, to exercise the jurisdiction in this cause.

Another question has been made in the defence, founded on a recent construction of of act of 1855, c. 231, by the supreme court of Massachusetts. This libel was filed in less than sixty days after the debt accrued. In the case of Tyler v. Currier [76 Mass. 54], not yet published, that court decided that a petition under this act, to enforce this lien in a state court, cannot be filed, until sixty days after the debt accrues; and it is contended that by force of this decision, or in-

dependently of this decision, on the true construction of the act, the libel in this court should not be filed within that time.

The act of 1855, after defining and establishing the lien, goes on to provide that it may be enforced by petition in the courts of the state "in the manner" provided by the Revised Statutes, c. 117, the 4th and subsequent sections. The chapter referred to, establishes the mode of procedure to enforce a lien on houses, for builders' contracts. Among other provisions of that chapter, is one that the petition shall not be filed, until the debt has remained unpaid for sixty days. In Tyler v. Currier [supra] the question was, whether by the term "in the manner," used in the act of 1855, the provision of the house-lien law respecting the sixty days, was incorporated into the ship-lien law. The supreme court held that it was. The reasoning of the court was, that the word "manner" was sufficient to include and carry with it the restriction of sixty days; and that policy favored that construction, the object of the legislature being to guard against the precipitate use of this summary process. If, says the court, the restriction as to time is not adopted, suits may be commenced in one day after the debts become due, and vessels be arrested, and large costs incurred. The restriction gives time for adjustment, notice and arrangements, and tends to prevent the hasty, vexatious, or unreasonable use of the remedy.

So far as process in the state court is concerned, I assume this decision to be a conclusive construction of the statute. But, of course, this decision cannot control or affect the processes of this court, as mere processes, or the modes and manner of proceeding here. The statute of 1855, after providing a remedy in the state court, declares that such provision shall not be construed as giving the state courts exclusive jurisdiction over the lien, "but the same may be enforced in the courts of the United States according to the course of proceedings in such courts." The statute, therefore, contemplates a special course of proceedings in the state courts, and the known "course of proceedings" in this court, in admiralty. This saving clause cannot give to this court jurisdiction, or affect its processes; nor could the absence of this clause have taken away its jurisdiction, or affected its remedies. But on a question of construction, the clause affords an argument, that the legislature knew and contemplated the use of a different "course of proceedings" here. It must be remembered that it is only by bringing the restriction as to sixty days within the term, "in the manner," that the supreme court imports it into the statute of 1855. Unless the restriction is a part of the "manner" of enforcing the lien, it cannot be affixed to the act of 1855. If the restriction in the Revised Statutes is a part of the right, an essential part of the lien, a portion of the law of property, and not of the law of remedy, then it cannot be affixed to the lien on ships, in the act of 1855, for it must pass under the term "manner," or it is no part of that act. And if it be a part of the "manner or course of proceedings," then as the state statute cannot affect the course of proceedings in this court, it would not apply here, if the statute attempted to apply it; and there is good ground for believing that the legislature did not attempt so to apply it. This is not only because the act in terms, contemplates a different "course of proceedings" here, but from the nature of the case.

The reasoning of the court in Tyler v. Currier is, that it was necessary to provide a guard against precipitate and unreasonable use of this extreme remedy. In the state courts this may be necessary. The suit to enforce a lien is commenced at the discretion of any attorney, and the vessel may be arrested at his discretion, by an attachment on a common writ (St. 1855, c. 231, § 3), which he purchases at the clerk's office, or, if on petition, the arrest is made as of course, by order of the clerk, as a mere ministerial officer. There is no provision for the intervention of any person clothed with discretion to refuse, or stay, or regulate the process. This is a difficulty inherent in courts acting on the common law system. If this were the object of the legislature, the safeguard is not necessary in this court. Here the suit must be commenced by a sworn libel, countersigned by a proctor who is responsible to the court, and who may be compelled to pay costs out of his own pocket, if he has sued out process improperly, even if the main cause is decided in his favor. The process does not, even then, issue as of course, but in the discretion of the judge in each case. The judge requires proof that notice has been given, or that there is danger the vessel will go to sea at once; and if there is time and no good reason to the contrary, he may, and often does, require a monition to show cause to issue, in the first instance, before the arrest; and on this monition, if stipulation is given, the arrest is dispensed with; or if good cause is shown, the ship owner is protected from vexatious process. All questions of costs are also in the control of the court, who may even give costs against a prevailing party. Now, as this "course of proceedings" in admiralty was known to, and recognized by the legislature, having been the only mode of enforcing the lien on domestic ships under the acts prior to that of 1855, it may well be that the legislature was satisfied with the safeguards afforded by the admiralty mode of procedure, and saw the necessity of establishing some substitute for it in the state courts, and did so by a positive rule of intervention of a fixed period of time, in all cases, knowing that it would be difficult to charge the duty of preliminary inquiry, in all cases, on judges of common law courts.

The result, therefore, is that, both upon the reason of the thing, and on the authority of the case of Tyler v. Currier, the sixty-day restriction, if a part of the act of 1855, is a part of the "manner" of procedure to enforce the right, and not part of the right itself. As such, it cannot be imported into this court by force of the state statute; and, in my opinion, the state statute does not attempt so to import it, but contemplates and recognizes the exercise by this court of a different manner and course of procedure.

These being the only defences to the suit, a decree must be made for the amount of the debt claimed.

NOTE. See resolutions of the king in council, February 18, 1632 (article 3): "If a suit shall be in the court of admiralty, for building, amending, saving, or necessary victualling of a ship, against the ship itself, and not against any party by name, but such as for his interest makes himself a party, no prohibition is to be granted, though this be done within the realm." Ben. Adm. 51.
To require the contract to be made upon the sea, as was said by Lord Kenyon, in Menetone v. Gibbons, 3 Durn. & E. [3 Term R.] 269, "borders upon absurdity." And it is said in Waring v. Clarke, 5 How. [46 U. S.] 459, that the supreme court of the United States, as well as the courts of common law in England, have affirmed the principle that the subject-matter, and not locality, determines the jurisdiction in cases of contract.